IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>ARDEN MCCANN | Criminal Action No.<br><br>1:20-cr-00084-JPB |

## United States' Sentencing Memorandum

The United States of America, by Ryan K. Buchanan, United States Attorney for the Northern District of Georgia, and C. Brock Brockington, Assistant United States Attorney, respectfully files this Sentencing Memorandum in advance of Defendant Arden McCann's sentencing.

## INTRODUCTION

On September 20, 2023, McCann pleaded guilty to conspiracy to import a controlled substance and a non-narcotic controlled substance into the United States from Canada and China, in violation of Title 21, United States Code, Section 963, and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 156(h). (Doc. 44). After reviewing the Presentence Investigation Report ("PSR"), McCann objected to the upward adjustments for possession of a dangerous weapon under USSG § 2D1.1(b)(1), distributing a controlled substance through mass-marketing by means of an interactive computer service under USSG § 2D1.1(b)(7), and his direct involvement in the importation of a controlled substance under USSG § 2D1.1(b)(16)(C). (PSR ¶¶ 59, 60, 62). Both parties objected to the four-level upward adjustment for McCann's aggravating role in the offense, arguing that the three-level adjustment should apply instead. (PSR ¶ 65).

In the plea agreement, the government agreed to recommend a two-level downward variance from the Adjusted Offense Level to negate the two-level upward adjustment pursuant to USSG § 2S1.1(b)(2)(B). (Doc. 44-1, ¶ 19). And the parties agreed to recommend an additional two-level downward variance at sentencing. (*Id*. at ¶ 20). The government also agreed to recommend that McCann receive an adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1, to the maximum extent authorized by the guideline. (*Id*. at ¶ 18). The agreement noted that the government would not be required to recommend acceptance of responsibility if, after entering the plea agreement, McCann engaged in conduct inconsistent with accepting responsibility, including through the participation in additional criminal conduct. (*Id*.)

As set forth below, (i) the Court should overrule McCann's objections to enhancements under USSG §§ 2D1.1(b)(1), (b)(7), and (b)(16)(C); (ii) McCann should receive a three-level upward adjustment for his role in the offense, rather than a four-level upward adjustment; (iii) McCann should not receive a downward adjustment for acceptance of responsibility based on evidence that he was involved in the possession and distribution of synthetic cannabinoids (K2) at the Robert A. Deyton Detention Center after entering his guilty plea; and (iv) the Court should apply a two-level downward variance from the Adjusted Offense Level to negate the upward adjustment pursuant to USSG § 2S1.1(b)(2)(B) and an additional two-level downward variance at sentencing.

## ARGUMENT

### A. Unresolved Guidelines Issue – USSG § 2D1.1(b)(1)

**1. The Court may rely on undisputed facts and conclusions in the PSR to determine whether disputed Guidelines enhancements apply.**

The government bears the burden of proving a sentencing enhancement by a preponderance of reliable evidence. *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999). The preponderance standard is not a difficult one, and simply requires proof that the existence of a fact is more probable than its nonexistence. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir. 2012); *United States v. Fuentes*, 107 F.3d 1515, 1531 (11th Cir. 1997) (equating preponderance standard with "more-likely-than-not" standard of review for purposes of restitution).

In making this inquiry, "[a]ny information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3, Commentary. This includes un-objected to or admitted portions of the PSR. *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004); *see also United States v. Aguilar-lbarra*, 740 F.3d 587, 592 (11th Cir. 2014) ("a defendant is deemed to have admitted any such statements that he has not objected to with specificity and clarity."). In fact, the Court is permitted to rely upon even conclusory statements in the PSR if the defendant fails to object to them. *United States v. Beckles*, 565 F.3d 832, 844 (11th Cir. 2009).

**2. McCann possessed firearms in October 2015 during the same course of conduct or common scheme or plan as the offense of conviction.**

Under 2D1.1(b)(1), a two-level upward adjustment applies if "a dangerous weapon (including a firearm) was possessed." USSG § 2D1.1. The commentary notes the enhancement "should be applied if the weapon was present, unless it was

clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n.11(A). The government carries the initial burden of proving a gun was present at the site of the charged conduct or the defendant possessed the gun during conduct associated with or relevant to the crime of conviction. *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). The government is not required to prove the gun was used to facilitate the distribution of drugs, but only that the gun was present during the drug-trafficking offense. *United States v. Audain*, 254 F.3d 1286, 1289-90 (11th Cir. 2001). Indeed, the enhancement applies when a gun is possessed during relevant conduct away from the site of the offense conduct. *United States v. Hunter*, 172 F.3d 1307, 1310-11 (11th Cir. 1999).

Section 2D1.1(b)(1) itself "does not require a connection between the offense and the firearm. It requires only that the firearm have been possessed by the defendant." *United States v. Hall*, 46 F.3d 62, 64 (11th Cir. 1995). "While the government generally has the burden of proving a guideline enhancement by a preponderance of the evidence, the § 2D1.1(b)(1) enhancement instead compels the government to show mere presence but places a heavy burden of negation on the defendant." *United States v. Carillo-Ayala*, 713 F.3d 82, 90 (11th Cir. 2013). In the Eleventh Circuit, "[a] firearm found in close proximity to drugs or drug-related items simply 'has' – without any requirement for additional evidence – the potential to facilitate the drug offense." *Id.* at 92.

If the government meets its burden, the burden shifts to the defendant to show that a connection between the gun and offense was "clearly improbable." *Stallings*, 463 F.3d at 1220. This is a higher quantum of proof than preponderance of the evidence. *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003)

(defining "clearly improbable" standard under § 2D1.1(b)(1) as a difficult one that entails more than showing the existence of a "possible innocent explanation" or a mere probability the gun was not connected to the offense). Failure to produce such evidence permits the Court to apply the enhancement. *Hall*, 46 F.3d at 63-64.

Here, in October 2015, McCann was arrested in Canada after authorities identified him as the person using the moniker DRXanax on the AlphaBay DNM to distribute alprazolam. (PSR ¶ 16). The authorities seized approximately two million counterfeit Xanax pills, five pill presses, alprazolam powder, 3,000 MDMA pills, over $200,000 in cash, 15 firearms, ballistic vests, and drug ledgers that showed McCann purchased alprazolam from China, pressed the alprazolam into counterfeit Xanax pills, and then sold the pills to customers throughout the United States. (*Id.*) In December 2015, McCann and CD-2 met at McCann's home in Montreal and agreed to an arrangement where McCann would send bulk amounts of Xanax from Canada to CD-2, who agreed to be McCann's United States-based re-shipper for the monikers Xanaxlabs and Pasitheas. (PSR ¶ 17).

McCann argues that the firearms he possessed in October 2015 do not warrant an adjustment under § 2D1.1(b)(1) because they were seized one month before the offense in Count Two, which charged a conspiracy beginning "at least as of on or about November 2015." (PSR ¶ 59; Doc. 9). And he claims that a connection between the gun and offense was "clearly improbable" because his offenses "relied mostly upon the dark net." (PSR ¶ 59). But the firearms were possessed one month before the charged conspiracy while he was manufacturing counterfeit Xanax pills and selling them to customers in the United States over dark net markets ("DNMs"). That is relevant conduct under USSG § 1B1.3(a)(2),

and McCann cannot meet his burden to show it was clearly improbable the guns were connected to the offense by pointing to the method used to sell the drugs.

Sentencing courts must consider all "relevant conduct," as defined in USSG § 1B1.3, when calculating a defendant's guideline range. *United States v. Siegelman*, 786 F.3d 1322, 1332 (11th Cir. 2015). The Eleventh Circuit broadly interprets the provisions of the relevant conduct guideline. *United States v. Behr*, 93 F.3d 764, 765 (11th Cir. 1996). A defendant must be held accountable for all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). Uncharged criminal activity outside of a charged conspiracy may be included in sentencing if the uncharged activity is sufficiently related to the conspiracy for which the defendant was convicted. *See United States v. Fuentes*, 107 F.3d 1515, 1525-26 (11th Cir. 1997). Offenses are part of the "same course of conduct" if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." USSG § 1B1.3, cmt. n.5(B)(ii). To make that determination, the Court evaluates "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Fuentes*, 107 F.3d at 1525. In doing so, the Court considers "whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind." *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994).

During the charged conspiracy, McCann used the monikers TheMailMan, Xanaxlabs, Pasitheas, WhiteYellowGreen, and XanaxBlotters to sell alprazolam

pills falsely labeled as Xanax, alprazolam powder, U-4770, and fentanyl analogues over DNMs, including AlphaBay. (PSR ¶¶ 11-13). McCann shipped alprazolam powder and pressed alprazolam pills from Canada, arranged for drugs to be imported from suppliers in China directly to customers in the United States, and coordinated with re-shippers in the United States who received large shipments of drugs from Canada and China and then fulfilled McCann's orders through domestic U.S. mail shipments.  (PSR ¶ 15).

The conduct in October 2015 fits squarely within this same course of conduct. Between at least August and October 2015, McCann purchased alprazolam from China, pressed the alprazolam into counterfeit Xanax pills in Canada, and then sold the pills to customers in the United States through the DRXanax moniker on the AlphaBay marketplace. (PSR ¶ 16). This is nearly identical conduct, repeated over the course of months, that was only briefly paused following McCann's arrest when the DRXanax moniker stopped operating on DNMs. Indeed, during the Montreal meeting with CD-2 in December 2015, McCann advised he was arrested based on his use of DRXanax but wanted to continue distributing drugs to the United States using the new monikers of Xanaxlabs and Pasitheas. (PSR ¶ 17). The Eleventh Circuit has found a sufficient connection between prior drug sales and the conduct of conviction despite substantially longer gaps between offenses than the one month in this case. *See United States v. Bruce*, 665 F. App'x 852, 857 (11th Cir. 2016) (finding sufficient connection between offenses despite a 15-month gap).

Simply put, McCann's charged conspiracy was a continuation of his conduct in October 2015 when the guns were seized. The degree of similarity of the

offenses, the regularity of the offenses, and the time interval between offenses all indicate that the uncharged offense involved the same course of conduct as the charged offenses and were sufficiently connected to be considered part of an ongoing series of offenses. USSG § 1B1.3, cmt. n.5(B)(ii). Thus, his possession of guns in October 2015 is relevant conduct in this case.

After the burden of proof shifts, McCann cannot point to the method used to sell the drugs to show that a connection between the gun and offense was "clearly improbable." McCann did not simply operate monikers on DNMs. He also purchased alprazolam from China, pressed the alprazolam into pills, and shipped the pills to customers throughout the United States. (PSR ¶ 16). The manufacture, storage, and shipment of drugs were all part of his offense. And the firearms were found with millions of pills, over $200,000 in drug proceeds, drug ledgers, and pill presses. (*Id.*) His subsequent use of a computer to sell the pills to customers in the United States over DNMs does not alter the connection between the offense and the firearms found at the location used to manufacture and store the drugs. The 15 guns possessed in October 2015 are substantively different from the example of an unloaded hunting rifle hidden in a closet, as contemplated by the Guidelines commentary. USSG § 2D1.1(b)(1), cmt. n.11(A).

3. **Alternatively, the enhancement under USSG § 2D1.1(b)(1) applies based on CD-2's possession of a firearm in March 2016.**

The enhancement under USSG § 2D1.1(b)(1) may apply when a gun is possessed by a co-conspirator. *United States v. Rodriguez*, 34 F.4th 961, 974 (11th Cir. 2022). The government must prove by a preponderance that (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of

possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant. *United States v. Pham*, 463 F.3d 1239, 1245 (11th Cir. 2006).

Here, in December 2015, McCann agreed to send CD-2 bulk amounts of Xanax from Canada so CD-2 could serve as McCann's U.S.-based re-shipper. (PSR ¶ 17). CD-2 shipped pills to customers ordering from the Pasitheas vendor page operated by McCann. (PSR ¶ 22). McCann mailed CD-2 bulk shipments of pressed alprazolam pills, emailed the orders to CD-2, and then CD-2 processed the orders and mailed the pills. (*Id*.) This arrangement continued until March 2016 when DEA agents searched CD-2's home and seized 12,000 alprazolam pills and a .40 caliber handgun. (*Id*.) CD-2 pled guilty to possession of that firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). (*Id*.)

First, undisputed facts show McCann and CD-2 were members of the conspiracy in March 2016. Second, to prove that possession was in furtherance of the conspiracy, the government need only show by a preponderance the gun was possessed "during conduct associated with the offense of conviction." *Stallings*, 463 F.3d at 1220. The burden then shifts to McCann to show a connection between the gun and offense is "clearly improbable." *United States v. Fields*, 408 F.3d 1356, 1359 (11th Cir. 2005). Here, the proximity of a gun and drugs at CD-2's home is sufficient to satisfy the government's burden. *United States v. Carillo-Ayala*, 713 F.3d 82, 91-92 (11th Cir. 2013). As in *Castillo-Allen*, there can be little doubt CD-2's possession was in furtherance of the conspiracy when he pled guilty to possession of a firearm in furtherance of a drug trafficking offense and possessed the gun at the home where he received, stored, and distributed drugs for McCann. *United States v. Castillo-Allen*, 567 F. App'x 738, 741 (11th Cir. 2014).

Third, CD-2' possession of a firearm in the home where he received, stored, and distributed large amounts of drugs for McCann was reasonably foreseeable to McCann. The Eleventh Circuit has repeatedly held that guns are a tool of the drug trade and there is a frequent and overpowering connection between their use and drug trafficking. *Pham*, 463 F.3d at 1246. Accordingly, it may be "reasonably foreseeable that a co-conspirator would possess a firearm where the conspiracy involved trafficking in lucrative and illegal drugs." *Id*. Because this conspiracy involved CD-2's receipt, storage, and distribution of pressed pills over an extended period of time, it was reasonably foreseeable that CD-2 felt the need to protect the inventory and proceeds by possessing a gun. *See Fields*, 408 F.3d at 1359 (holding that guns were possessed in furtherance of a drug conspiracy and reasonably foreseeable when found at the location from which co-conspirators distributed drugs); *United States v. Plummer*, 327 F. App'x 177, 181-82 (11th Cir. 2009) (upholding enhancement for courier who delivered drugs to a co-conspirator's home where drugs and guns were found). The enhancement applies even if McCann claims he was unaware of the firearm and never present at CD-2's home. *Pham*, 463 F.3d at 1246 (noting that the Eleventh Circuit has upheld the enhancement even where defendants were unaware of the firearm possession). Thus, the Court should overrule McCann's objection.

## B. Unresolved Guidelines Issue – USSG § 2D1.1(b)(7)

### 1. Undisputed facts in the PSR establish that McCann used DNMs to sell drugs, warranting the enhancement under USSG § 2D1.1(b)(7).

Under § 2D1.1(b)(7), a two-level upward adjustment applies if "the defendant, or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct), distributed a controlled substance through mass-

marketing by means of an interactive computer service." USSG § 2D1.1(b)(7).
This enhancement was added to the Guidelines in 2004 after the Sentencing
Commission "identified use of an interactive computer service as a tool providing
easier access to illegal products." USSG App. C, Amend. 667, Reason for
Amendment at ¶ 2. The Commission noted that an interactive computer service
provides criminals an easier method to market products and makes it more difficult
for law enforcement to uncover the crime and punish offenders. *Id*.

　　"'Mass-marketing by means of an interactive computer service' means the
solicitation, by means of an interactive computer service, of a large number of
persons to induce those persons to purchase a controlled substance." USSG
§ 2D1.1, cmt. n.13. "Interactive computer service" means "any information,
service, system, or access software provider that provides or enables computer
access by multiple users to a computer server, including specifically a service or
system that provides access to the Internet and such systems operated or services
offered by libraries or educational institutions." *Id*.; 47 U.S.C. § 230(f)(2). The
Guidelines commentary notes that the enhancement would apply to a defendant
who operated a web site to promote the sale of GHB, but not to co-conspirators
who use an interactive computer service only to communicate with one another in
furtherance of the offense. *Id*. § 2D1.1, cmt. n.13.

　　Here, McCann was one of the largest DNM vendors between 2015 and
2020. (PSR ¶ 11). McCann used numerous monikers to sell controlled substances
over DNMs, and the vendor pages for each of these monikers showed he
distributed the drugs to various countries, including the United States and Canada.
(PSR ¶ 12). McCann sold the drugs through DNMs and direct deals. (PSR ¶ 14).

When purchases were made through DNMs, customers paid in Bitcoin through the DNM, which charged a fee. (*Id*.) McCann then withdrew the funds from the DNM and moved the Bitcoin into his personal wallet. (*Id*.) When purchased through direct deals, McCann communicated directly with customers through encrypted emails or applications and provided customers with a wallet to deposit the funds. (*Id*.) CD-2 regularly purchased alprazolam from McCann, using the DRXanax moniker, on the AlphaBay DNM. (PSR ¶ 16). McCann operated the Pasitheas vendor pages on DNMs, received orders from the DNM, and then emailed CD-2 the orders from the DNM so that CD-2 could distribute the drugs to customers in the United States on McCann's behalf. (PSR ¶ 22). Similarly, McCann operated the Pasitheas and Xanaxlabs vendor pages on DNMs, received orders from the DNM, and emailed WCB the order information so that WCB could distribute the drugs on McCann's behalf. (PSR ¶ 25).

In sum, McCann's vendor page offered to sell drugs and provided an easy means to purchase them. An offer to sell products is by its very nature an inducement to purchase such products. This is especially so when the website offers particularly easy means of purchasing an item. The sale of drugs illegally requires no "legitimacy lure." Thus, merely operating a website that offers to sell drugs illegally constitutes "mass marketing" in the drug world. In this regard, an illegal drug operation is more akin to the sale of child pornography, which has no legitimate marketplace. "Mass marketing" in the illegal drug market must be given a commonsense definition consistent with the Sentencing Commission's intent and with the illegal marketplace being considered.

12

Case 1:20-cr-00084-JPB-JEM    Document 62    Filed 12/26/24    Page 13 of 26

In *Hanny*, the Eighth Circuit held that a website that permitted customers to "actively shop for, select, and purchase controlled substances" satisfied the mass marketing enhancement.[1] *United States v. Hanny*, 509 F.3d 916, 920 (8th Cir. 2007). The court rejected the defendant's argument that he did not "solicit" customers because he did not place an ad or send emails to generate sales, noting that "[t]he operation of an interactive website devoted to the illegal sale of controlled substances that is freely accessible to all members of the public is sufficiently enticing to constitute solicitation." *Id*. Here, as in *Hanny*, offering controlled substances for sale was not a minor part of McCann's DNM vendor pages – it was the very reason the pages existed. *Id*.

Simply put, McCann advertised the sale of controlled substances on the DNM vendor pages, and customers purchased drugs from him through those pages. The vendor pages not only allowed prospective customers "to read the products offered for sale" but also permitted them "to actively shop for, select, and purchase" pills. *Id*. That conduct falls squarely within the example in the application note and holding in *Hanny*. USSG § 2D1.1, cmt. n.13; *Hanny*, 509 F.3d at 920. That customers accessed McCann's vendor page on DNMs through The Onion Router (Tor) does not alter this analysis. *See United States v. Glarner*, 2021 WL 4926113, 2021 U.S. App. LEXIS 31706 at *5-6 (9th Cir. 2021) (applying enhancement for 1,500 drug sales as a vendor on a darknet website, "a platform that was able to reach large numbers of people for purposes of conducting illicit sales"). Section 2D1.1(b)(7) requires the solicitation of a large number of persons to induce them to purchase controlled substances, not public solicitation on a

---

[1] In 2007, this enhancement was listed as § 2D1.1(b)(5).

website accessible through a Google search. Based on data seized from only two DNMs, McCann fulfilled 8,345 orders for more than $10 million. (PSR ¶ 49). This constitutes solicitation of "a large number of persons." USSG § 2D1.1, cmt. n.13.

Indeed, courts have applied this enhancement based on a defendant posting to much smaller groups of Facebook friends that he had "bags" of synthetic cannabinoid available. *See United States v. Martinez*, 832 F. App'x 284, 286 (5th Cir. 2020) (posting to 3,100 Facebook friends); *United States v. Perez*, 840 F. App'x 792, 794 (5th Cir. 2020) (posting to 450 Facebook friends). In those cases, as with McCann's direct deals, customers who viewed the posting would reach out to the seller and conduct the purchase outside the Facebook website. McCann's sales through DNMs are much closer to the example highlighted in the application note than the solicitation in *Martinez* and *Perez*. Thus, the Court should overrule McCann's objection.

## C. Unresolved Guidelines Issue – USSG § 2D1.1(b)(16)(C)

### 1. Undisputed facts in the PSR establish that McCann was directly involved in the importation of a controlled substance.

Under § 2D1.1(b)(16)(C), a two-level upward adjustment applies if a defendant receives an adjustment under § 3B1.1 for an aggravating role and was "directly involved in the importation of a controlled substance." USSG § 2D1.1(b)(16)(C). The Guidelines commentary notes that the enhancement applies if the defendant "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the importation of a controlled substance." *Id*. § 2D1.1, cmt. n.20(B). In other words, the enhancement must be based on the defendant's own conduct, not the reasonably foreseeable acts of others in furtherance of jointly undertaken activity. *See id*.; USSG § 1B1.3(a)(1)(B).

McCann lived in Canada throughout this conspiracy, but the drugs he sold were distributed to 49 states. (PSR ¶ 11). McCann used three methods to import drugs into the United States. (PSR ¶ 15). First, he shipped alprazolam powder and pressed alprazolam pills from Canada. (*Id*.) Second, he arranged for drugs to be imported from suppliers in China directly to customers in the United States. (*Id*.) Third, he coordinated with re-shippers in the United States who received large shipments of drugs from China or Canada and then fulfilled McCann's orders through domestic mail shipments. (*Id*.) Drug ledgers seized from McCann in October 2015 revealed that he and his conspirators purchased alprazolam from China, pressed the alprazolam into counterfeit Xanax, and then sold the pills to customers throughout the United States. (PSR ¶ 16). On January 13, 2016, McCann arranged to send Cedrik Bourgault-Morin across the border from Canda to Vermont with 281,307 alprazolam tablets on a sled to begin using CD-2 as a re-shipper. (PSR ¶¶ 20-21). The drugs were seized in Vermont before CD-2 could collect them, but McCann proceeded with the arrangement by mailing bulk shipments of alprazolam pills to CD-2. (PSR ¶ 22). CD-2 received international shipments from McCann even after DEA agents searched his home. (PSR ¶ 23). On three occasions, McCann arranged to have two kilograms of alprazolam powder shipped to CD-2 from China. (PSR ¶ 24). McCann sent WCB alprazolam powder from China so that WCB could press pills in the United States. (PSR ¶ 26). And agents identified three separate sources of supply in China that McCann used to order alprazolam powder and fentanyl analogues. (PSR ¶ 40).

Here, McCann pled guilty to a conspiracy to import controlled substances into the United States from China and Canada. And the undisputed facts show that,

at a minimum, he aided, abetted, or willfully caused the importation of a controlled substance. USSG § 2D1.1, cmt. n.20(B). The enhancement under § 2D1.1(b)(16)(C) does not apply to only those defendants who themselves transport drugs across the border. *See United States v. Derilus*, 668 F. App'x 349, 351 (11th Cir. 2016)[2] (finding that there was sufficient evidence to support the enhancement when the defendant met with members of the conspiracy in Haiti and the United States, told crewmembers where the cocaine was stored on the ship, and met with owners of the ship used to smuggle the cocaine). Ordering drugs from China and having them shipped to the United States is sufficient. *United States v. Reason*, 720 F. App'x 591, 596-97 (11th Cir. 2018) (finding that enhancement applied because defendant ordered drugs from China, sent wire transfers to China, and distributed the drugs in the United States).

In *Romero*, the defendant argued that this enhancement did not apply because he was "neither physically present in the United States nor 'directly' involved in smuggling cocaine across the United States border." *United States v. Romero*, 904 F.3d 238, 242 (2d Cir. 2018). The Second Circuit rejected this argument because the defendant, like McCann, aided and abetted the importation even if he was not physically present in the United States and did not personally transport the drugs across the border. *Id*. at 243. McCann willfully caused drugs to be imported from China or Canada to re-shippers in the United States by sled and mail, which falls within the conduct identified by the text of the commentary. Thus, the Court should overrule his objection.

---

[2] In 2016, this enhancement was listed as § 2D1.1(b)(15)(C).

**D. Unresolved Guidelines Issue – USSG § 3B1.1**

**1.  The Court should apply the three-level upward adjustment under § 3B1.1(b) for McCann's role in the offense.**

Under § 3B1.1(b), the offense level is increased by three levels if the defendant was a manager or supervisor (but not organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive. USSG § 3B1.1(b). A four-level upward adjustment applies if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. USSG § 3B1.1(a). In distinguishing between leadership roles, factors the Court should consider include "the exercise of decision-making authority, the nature or participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id*. § 3B1.1, cmt. n.4. "This multi-factor analysis requires the Court to decide on a 'case-by-case basis,' under the totality of the circumstances, whether the enhancement should apply." *United States v. Rodriguez*, 805 F. App'x 773, 777 (11th Cir. 2020).

Here, the parties jointly recommend an enhancement under USSG § 3B1.1 because of McCann's role in the offense. And there is no dispute the conspiracy involved more than five participants. But the parties recommend the Court find that McCann is a manager or supervisor, subject to a three-level adjustment, rather than an organizer or leader, subject to a four-level adjustment.

An enhancement for McCann's leadership role in the criminal conduct is warranted because he used conspirators to import drugs into the United States (see

17

PSR ¶¶ 20-21) and re-shippers to receive imported drug shipments and distribute them to customers in the United States. (PSR ¶¶ 18, 22-26, 35). The management enhancement is appropriate where, as here, a defendant arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy. *United States v. Jenkins*, 742 F. App'x 455, 457 (11th Cir. 2018) (citing *United States v. Perry*, 340 F.3d 1216, 1217-18 (11th Cir. 2003)). The mere direction of others is sufficient to sustain an adjustment for role in the offense. *United States v. Jiminez*, 224 F.3d 1243, 1251 (11th Cir. 2000).

To be sure, McCann's conduct establishes factors listed in the Guidelines commentary, including the exercise of decision-making authority and recruitment of accomplices. And the Eleventh Circuit has found such conduct sufficient to uphold enhancements under USSG § 3B1.1(a). *See e.g.*, *United States v. Thomas*, 446 F.3d 1348, 1355 n.2 (11th Cir. 2006) (defendant was an "organizer or leader" in part because he recruited co-conspirators); *United States v. Ndiaye*, 434 F.3d 1270, 1304 (11th Cir. 2006) (defendant was an "organizer or leader" because he recruited and instructed conspirators). But those same factors have justified enhancements under USSG § 3B1.1(b). *See e.g.*, *United States v. Njau*, 386 F.3d 1039, 1041 (11th Cir. 2004) (defendant was "manager or supervisor" because he recruited accomplices); *United States v. Vasquez*, 486 F. App'x 830, 835 (11th Cir. 2012) (defendant was "manager or supervisor" because he recruited two accomplices); *United States v. Maciel-Macedo*, 485 F. App'x 382, 284 (11th Cir. 2012) (defendant was "manager or supervisor" because he made unilateral decisions on drug shipments and exercised decision-making authority over at least three conspirators). Simply put, it can be difficult to distinguish between the three-

18

level and four-level enhancements under USSG § 3B1.1. The government recommends that the Court find that the totality of circumstances warrant the finding that McCann was a manager or supervisor under § 3B1.1(b).

## E. Unresolved Guidelines Issue – USSG § 3E1.1

**1. A downward adjustment for acceptance of responsibility is not warranted because McCann was involved in the possession and distribution of K2 at the Robert A. Deyton Detention Center after entering his guilty plea.**

On September 20, 2023, McCann pleaded guilty pursuant to a plea agreement in which the government agreed to recommend that he receive an offense level adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1, to the maximum extent authorized by the guideline. (Doc. 44-1, ¶ 18). Pursuant to the agreement, the government is not required to recommend acceptance of responsibility if, after entering the plea agreement, McCann engaged in conduct inconsistent with accepting responsibility, including through the participation in additional criminal conduct. (*Id*.) At the sentencing hearing, the government will present evidence that McCann was involved in the possession and distribution of a synthetic cannabinoid ("K2") while in custody at the Robert A. Deyton Detention Center ("RADD") in the months following his guilty plea in 2023. This evidence is related to an investigation conducted by the DEA following the suspected overdose death of D.R. on May 20, 2024 while D.R. was being housed in the same pod as McCann. The government plans to present video footage from McCann's pod on May 20, as well as evidence related to the seizure of paper believed to be laced with a synthetic cannabinoid in McCann's cell, and McCann's involvement in the distribution of K2 prior to that date. To be clear, the

government does not plan to prove that the substance he distributed resulted in
D.R.'s overdoes death. But the government will prove that McCann was involved
in the distribution of K2 at RADD following his guilty plea in this case. Based on
this evidence, the government will not recommend McCann receive an adjustment
for acceptance of responsibility. And the Court should not find that such an
adjustment is warranted.

Under USSG § 3E1.1(a), if "the defendant clearly demonstrates acceptance
of responsibility" for the offense, his offense level is decreased by two levels,
which can be increased to three levels upon motion of the government stating that
the defendant has assisted authorities in the investigation or prosecution of his own
misconduct. USSG § 3E1.1. The commentary states that appropriate considerations
for determining whether a defendant qualifies under § 3E1.1(a) include truthfully
admitting the conduct comprising the offenses of conviction and voluntarily
terminating or withdrawing from criminal conduct. *Id*. § 3E1.1, cmt. n.1. The
defendant bears the burden of clearly demonstrating he has accepted personal
responsibility. *United States v. Wright*, 862 F.3d 1265, 1279 (11th Cir. 2017).
Significant evidence of acceptance of responsibility includes (a) entering a plea of
guilty prior to trial, (b) truthfully admitting the conduct comprising the offense of
conviction, and (c) truthfully admitting or not falsely denying any additional
relevant conduct for which he is held accountable under § 1B1.3. *Id*. § 3E1.1, cmt.
n.3. But "this evidence may be outweighed by conduct of the defendant that is
inconsistent with such acceptance of responsibility." *Id*. Accordingly, "[a]
defendant who enters a guilty plea is not entitled to an adjustment under this
section as a matter of right." *Id*.

"Acceptance of responsibility is a multi-faceted concept that considers, among other things, the offender's recognition of the wrongfulness of his conduct, his remorse for the harmful consequences of that conduct, and his willingness to turn away from that conduct in the future." *United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir. 1989). A wide range of evidence can be considered to determine whether McCann has accepted responsibility. *Id*. The Eleventh Circuit has "consistently found that subsequent criminal conduct is a valid basis for denying an acceptance of responsibility adjustment." *United States v. Raimondi*, 620 F. App'x 803, 805 (11th Cir. 2015) (citing *United States v. Davis*, 878 F.2d 1299, 1300-01 (11th Cir. 1989) (holding continued drug use while out on bond supports denying acceptance of responsibility). This includes post-plea prison conduct. *See Raimondi*, 620 F. App'x at 805 (denying acceptance based on prison conduct, including possession of a weapon, violence against another inmate, and refusal to comply with prison officials). The Court may consider subsequent criminal conduct in deciding whether a decrease pursuant to § 3E1.1 is appropriate even if that conduct is unrelated to the offense of the conviction. *United States v. Pace*, 17 F.3d 341, 343 (11th Cir. 1994) (denying acceptance based on personal use of marijuana after plea to making false claims against the United States); *Wright*, 862 F.3d at 1279 (denying acceptance based on misdemeanor marijuana possession while on bond in tax case).

Here, the Court should find that McCann was involved in the possession and distribution of synthetic cannabinoids at RADD following his September 2023 guilty plea. Accordingly, the Court should not reduce his offense level under § 3E1.1. The resumption of criminal conduct after his guilty plea shows McCann's

unwillingness to turn away from the criminal lifestyle that led to the initial arrest and, therefore, that he has not accepted responsibility. *Scroggins*, 880 F.2d at 1215-16 (continued use of cocaine supports denying acceptance). As the Supreme Court noted, when a defendant "obviously did not cease his life of crime, receipt of a sentencing reduction for acceptance of responsibility would … [be] so ludicrous as itself to compromise the public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 143 (2009). So too here.

**F. Downward Variances Recommended by the Government**

First, in the plea agreement, the government agreed to recommend a two-level downward variance from the Adjusted Offense Level to negate the two-level upward adjustment pursuant to USSG § 2S1.1(b)(2)(B). (Doc. 44-1, ¶ 19). The parties do not dispute that the Adjusted Offense Level for the money laundering offense in Count Four is two levels higher than the Adjusted Offense Level for the drug importation offense in Count Two because of the application of § 2S1.1(b)(2)(B). (*Compare* PSR ¶ 67 *with* ¶ 75). In effect, this recommendation ensures that McCann's Guidelines range is based on his drug trafficking conduct, rather than the laundering of his drug proceeds.

The government recommends this variance because the heart of McCann's conduct involved the use of DNMs to distribute an incredible quantity of drugs throughout the world, including 49 states in the United States. The scope, duration, and danger posed by this conduct serves as the basis for government arguments related to the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the offense, provide just punishment, and protect the public from further crimes. Thus, to achieve the goal of a fair and

reasonable sentence, the government recommends a downward variance to the Guidelines range that applies to the drug offense.

Second, in the plea agreement, the parties agreed to recommend McCann receive an additional two-level downward variance at sentencing. (Doc. 44-1, ¶ 20). McCann faces a Total Offense Level of 49 if, as the government requests, the Court overrules McCann's objections, sustains the joint objection to McCann's role in the offense, does not apply a reduction for acceptance of responsibility, and grants the government's variance from the Adjusted Offense Level.[3] An offense level of more than 43 is to be treated as an offense level of 43. USSG, Sent. Table, cmt. n.2. At sentencing, the government will recommend an additional two-level downward variance to a sentence within the range of 324-405 months.

The PSR reflects McCann's direct involvement in the sale of alprazolam, fentanyl, and fentanyl analogues over DNMs from 2014 through his arrest in February 2020. (PSR ¶¶ 16, 19, 44). This six-year period coincided with a dramatic increase in overdose deaths in the United States, with the majority involving synthetic opioids such as fentanyl and fentanyl analogues.[4] And McCann knew from the beginning that DNM customers were dying from drug overdoses. (PSR ¶ 19). That knowledge did not stop him. Nor did the October 2015 search warrant when authorities in Canada identified him as the user of DRXanax and seized pill presses, millions of pills, over $200,000 in cash, and 15 firearms. (PSR ¶ 16). Less

---

[3] If the Court overrules McCann's objections, the Adjusted Offense Level will be above 43 even if the Court applies a reduction for acceptance of responsibility.

[4] Dep't of Health and Hum. Servs., Ctrs. for Disease Control and Prevention, Nat'l Ctr. for Health Stats., NCHS Data Brief No. 491, Drug Overdose Deaths in the United States, 2002-2022, at 4 (Mar. 2024), *Available at* https://www.cdc.gov/nchs/products/databriefs/db491.htm.

than two months later, McCann met with CD-2 to establish operations for new monikers on DNMs. (PSR ¶ 17). McCann was not deterred when agents seized drugs he sent to the United States, arrested the individuals carrying those drugs, or identified his re-shippers. (PSR ¶¶ 20-23). Instead, he sent WCB a pill press to ensure the production of drugs would not falter. (PSR ¶ 26). None of the consequences borne by others – his conspirators, customers, and society at large – dissuaded him from ramping up his operation until he was one of the largest DNM vendors in the world. (PSR ¶ 11).

McCann revealed the motivation for this dogged pursuit during meetings with the UC in Canada – at his peak, he was making $1 million per month. (PSR ¶ 34). He bragged that Canadian law enforcement had returned his phone with over $1 million in drug proceeds on it during his prior arrest. (*Id*.) In the months before his arrest, McCann said he could guarantee the UC a minimum profit of $100,000 if the UC moved to the United States and served as his re-shipper working with a 50/50 split of profits. (PSR ¶ 35). Simply put, for McCann, the staggering amount of money he was making was a fair price for the death and destroyed lives of the United States' citizens left in his wake. A substantial sentence is necessary to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence to McCann and others who sell drugs over DNMs, and protect the public from further crimes of the defendant.

Nevertheless, the government in the plea agreement agreed to recommend a two-level downward variance to account for the conservation of prosecutorial and judicial resources from McCann's agreement to plead guilty despite an advisory Guidelines range of life imprisonment and to meet the goal of achieving a fair and

reasonable sentence.  The government is hopeful that consequence will finally end McCann's involvement in drug trafficking that affected so many lives in the United States

### Conclusion

Based on the foregoing, and in addition to any argument the government offers at the sentencing hearing, the government respectfully requests that the Court OVERRULE McCann's objections to PSR paragraphs 59, 60, and 62, SUSTAIN the joint objection to PSR paragraphs 65 and 73, FIND that McCann was involved in the possession and distribution of synthetic cannabinoids at RADD following his September 2023 guilty plea warranting no reduction under § 3E1.1, and GRANT the government's motion for a two-level downward variance from the Adjusted Offense Level.

Respectfully submitted,

RYAN K. BUCHANAN
    *United States Attorney*


*/S/ BROCK BROCKINGTON*
C. BROCK BROCKINGTON
    *Assistant United States Attorney*
Georgia Bar No. 775084
600 Richard B. Russell Federal Building
75 Ted Turner Drive SW
Atlanta, Georgia 30303
Phone:  (404) 581-6000
Fax:     (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record:

Lawrence Zimmerman and Kyle Winchester

December 26, 2024

*/s/* *Brock Brockington*

C. Brock Brockington

*Assistant United States Attorney*